1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| JESSE TREVINO, | ) | Case No.: 1:14-cv-001873 - JLT |
| Plaintiff, | ) ) | ORDER GRANTING IN PART AND DENYING IN |
| v. | ) ) | PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| CITY OF BAKERSFIELD, et al., | ) ) | |
| Defendants. | ) ) | |
| | ) | |

Plaintiff Jesse Trevino, who is deaf, asserts that Bakersfield Police Officer Ryan Miller used excessive force in the course of detainment.  Plaintiff also asserts the City is liable for violations of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990.   Further, Plaintiff seeks to hold both the City and Officer Miller liable for assault, battery, and negligence. Defendants argue Plaintiff is unable to succeed on each of these claims, and seek summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Doc. 36)

Because there are genuine issues of material facts related to whether the force used by Officer Miller was reasonable, Defendants' motion for summary judgment is granted in part and denied in part.

**I.      Procedural History**

Plaintiff alleges that on the afternoon of October 16, 2013, Officer Miller "gave commands to Plaintiff while his back was turned, when he knew or reasonably should have known that Plaintiff was hearing impaired."  (*Id.* at 7, ¶ 17)  He contends Officer Miller "struck Plaintiff in the back, and tackled

1

him from behind causing him to forcefully fall to the ground."  (*Id.*, ¶ 18)  Plaintiff alleges, "Being struck and tackled caused Plaintiff to suffer mental, emotional, and physical injuries, including but not limited to, a fractured wrist, bruises and abrasions."  (*Id.*, ¶ 19)

In addition, Plaintiff contends the City "discriminated against or failed to reasonably accommodate Plaintiff with regard to their services, programs and activities."  (Doc. 1 at 15, ¶ 46) According to Plaintiff, "[s]uch programs and activities included the safe and appropriate provision of law enforcement services at or upon Plaintiff's residence, and upon Plaintiff, who was not fleeing, did not pose a threat, and/or was not a flight risk.  (*Id.*)

Based upon these facts, Plaintiff identified the following claims for relief: a violation of the Fourth Amendment right to be free from excessive force; a violation of the Rehabilitation Act, 29 U.S.C. § 701; a violation of Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131; a violation of the Bane Act, Cal. Civ. Code § 52.1; assault and battery; intentional infliction of emotional distress; and negligence.  (*See generally* Doc. 1 at 9-25)  Plaintiff dismissed the Bakersfield Police Department as a defendant on December 19, 2014.  (Doc. 11)  The same date, the City and Officer Miller filed their Answer to the allegations, denying any wrongdoing.  (Doc. 12)

On February 11, 2016, the parties filed a stipulation for the dismissal of several claims.  (Docs. 34, 35)  Accordingly, the claims remaining in this action include: (1) a Fourth Amendment violation against Officer Miller, (2) violation of the Rehabilitation Act against the City, (3) violation of Title II against the City; (4) assault and battery against the City and Officer Miller; and (5) negligence against the City and Officer Miller.  (*See id.*)

Defendants filed the motion for summary judgment now pending before the Court on February 12, 2016, asserting Plaintiff is unable to succeed on the remaining claims.  (Doc. 36)  Plaintiff filed his opposition on March 4 (Doc. 37), to which Defendants filed a reply on March 11, 2016 (Doc. 38).

## II.    Legal Standards for Summary Judgment

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim.  Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted).  The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same.  *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

Summary judgment, or summary adjudication, should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact.  *Celotex,* 477 U.S. at 323.  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).  A party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue of a material fact.  Fed R. Civ. P. 56(e); *Matsuhita*, 475 U.S. at 586.  An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 587.  The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits. *Id.* at 586 n.11; Fed. R. Civ. P. 56(c).  Further, the opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth

1    at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir.

2    1987).  However, "failure of proof concerning an essential element of the nonmoving party's case

3    necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

4         The Court must apply standards consistent with Rule 56 to determine whether the moving party

5    demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law.

6    *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).  In resolving a motion for summary

7    judgment, the Court can only consider admissible evidence.  *Orr v. Bank of America, NT & SA*, 285

8    F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854

9    F.2d 1179, 1181 (9th Cir. 1988)).  Further, evidence must be viewed "in the light most favorable to the

10   nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party.  *Orr*,

11   285 F.3d at 772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

12   **III.   Undisputed Material Facts**[1]

13        On the afternoon of October 16, 2013, Officer Miller "was dispatched to an apartment complex

14   located at 8200 Kroll Way in Bakersfield, California."  (JSF 1)  Officer Miller was informed that a

15   possible burglary was in progress, and an individual "was kicking in the front door and then trying to

16   use a rock to strike the door handle."  (JSF 3)  "Officer Miller was advised that the suspect was a

17   Hispanic male, 40s, with glasses, wearing a blue shirt and dark pants."  (JSF 4)

18        Officer Miller arrived at the apartment complex alone, without a partner in his car.  (JSF 2)  "As

19   soon as Officer Miller arrived, he saw the Plaintiff, who matched the description of the suspect,

20   walking westbound towards the parking lot."  (JSF 7)  When Officer Miller saw Plaintiff, "he was

21   approximately 30 yards [away]."  (JSF 8)  Officer Miller reports he "called out 'hey man, can I talk to

22   you?' and then he yelled 'Stop. Police.'"  (JSF 9)  Plaintiff "kept walking," and Officer Miller ran after

23   him.  (JSF 9, 10)  While running, "Officer Miller continued to yell 'stop police.'"  (JSF 11)

24        When Officer Miller reached Plaintiff, he used his forearm "to push Mr. Trevino onto the

25   ground."  (JSF 12)  He was running "almost at a sprint" "when he hit [Plaintiff] from behind."  (UMF

26

27               [1] The parties prepared a Joint Statement of Undisputed Material Facts ("JSF").  (Doc. 30-2).  In addition, the parties prepared separate facts in connection with their motion and opposition.  To the extent the fact is undisputed and the Court

28   found the evidence cited supports the fact, these are identified as Undisputed Material Facts ("UMF").

17; Miller Depo. 36:11: 20)   Officer Miller reported he "was trying to knock Mr. Trevino off balance in order to gain compliance," and pushed him onto the grass.  (JSF 13, 14)  After Plaintiff was on the ground, he told Officer Miller, "I can't hear you."  (JSF 15)  Officer Miller placed handcuffs on Plaintiff "because he still felt he had a crime in progress," after which he "noticed swelling in [Plaintiff's] left wrist and called for an ambulance."  (JSF 16, 17)  Miller removed the handcuffs and the ambulance arrived approximately three minutes later.  (JSF 81; UMF 6)

Officer Miller attempted to question Plaintiff, to which Plaintiff "responded that he did not read lips."  (JSF 20, 21)  Officer Miller then took out a notepad and wrote: "why are you breaking into that house?"  (JSF 22)  Plaintiff verbally responded and informed Officer Miller that he lived there, but tried "to force the door open because he had forgotten his key."  (JSF 22, 23)

Officers with the Bakersfield Police Department, including Officer Miller, "are trained that a person not answering a question or obeying a command or instruction may be an indicator of a hearing impairment."  (UMF 10, 11; Pflugh Depo. 49:12-16)  Officer Miller "was instructed that an officer must be aware of the fact that if a person does not answer a question or obey a command or instruction, he or she may not be refusing to cooperate."  (UMF 11)  Officer Miller testified he did not consider whether Plaintiff could not understand him or hear him while running after him, or prior to pushing Plaintiff to the ground.  (UMF 21; Miller Depo. 41:23-42:7)

**IV.    Request for Judicial Notice**

The Court may take judicial notice of a fact that "is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

Here, Defendants request that the Court take judicial notice of the Complaint filed by Plaintiff on November 25, 2014 (Doc. 1) and the Answer filed by Defendants on December 16, 2014 (Doc. 9). The records of court proceedings cannot reasonably be questioned, and judicial notice may be taken of the Court's record and docket.  *Mullis v. United States Bank. Ct.*, 828 F.2d 1385, 1388 n.9 (9th Cir. 1987); *Valerio v. Boise Cascade Corp.*, 80 F.R.D. 626, 635 n. 1 (N.D.Cal.1978), *aff'd*, 645 F.2d 699 (9th Cir. 1981); *see also Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th. Cir. 1980). Accordingly, the Court may take judicial notice of the filing of these documents.  However, the Court

declines to take judicial notice of the factual allegations therein, to the extent they are contradicted by the stipulated facts and evidence presented by the parties.

## V.    Discussion and Analysis

### A.    First Claim for Relief: Violation of the Fourth Amendment under 42 U.S.C. § 1983

Section 1983 "is a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994).  In relevant part, Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

42 U.S.C. § 1983. To establish a Section 1983 violation, a plaintiff must show (1) deprivation of a constitutional right and (2) a person who committed the alleged violation acted under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Williams v. Gorton*, 529 F.2d 668, 670 (9th Cir. 1976).

A plaintiff must allege a specific injury was suffered, and show causal relationship between the defendant's conduct and the injury suffered.  *See Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976).  A person deprives another of a right "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do so that it causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

Plaintiff asserts Officer Miller is liable for a violation of the Fourth Amendment, which prohibits arrests without probable cause or other justification.  (Doc. 1 at 9-10)  Specifically, the Fourth Amendment provides: "The right of the people to be secure in their persons. . . against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . the persons or things to be seized." *U.S. Constitution, amend. IV.*

#### 1.    Unlawful Seizure

As an initial matter, in the complaint, Plaintiff asserts Officer Miller is liable for a violation of his Fourth Amendment right to be free from an unlawful seizure.  (Doc. 1 at 9)  A plaintiff may succeed on a claim for an unlawful seizure where the arrest is made without probable cause, which "exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable

6

1  caution to believe that an offense has been or is being committed by the person being arrested."

2  *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1023 (9th Cir. 2009) (quoting *United States v. Lopez*,

3  482 F.3d 1067, 1072 (9th Cir. 2007)).

4      Officer Miller received information from dispatch describing the person suspected of a

5  residential burglary in process, and saw Plaintiff who matched the description given.  (JSF 4, 5)

6  Notably, Plaintiff does not oppose summary adjudication of his first claim for relief to the extent it is

7  based upon an unlawful arrest, and focuses solely on the claim of excessive force. (*See* Doc. 37 at 9-12)

8  In light of the stipulated facts and evidence presented, there is no dispute that Office Miller had

9  probable cause to effectuate an arrest.  Accordingly, Defendants' motion for summary adjudication of

10  the First Claim for Relief, on the grounds of an unlawful seizure, is **GRANTED**.

11          2.      Excessive Use of Force

12      The Supreme Court of the United States has determined that the Due Process Clause of the

13  Fourteenth Amendment protects individuals who have not yet been convicted of a crime "from the use

14  of excessive force that amounts to punishment."  *Graham v. Connor*, 490 U.S. 386, 388 (1989).

15  However, allegations of excessive force during the course of an arrest are analyzed under the Fourth

16  Amendment, which prohibits arrests without probable cause or other justification. *Id.* ("claim[s] that

17  law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or

18  other 'seizure' ... are properly analyzed under the Fourth Amendment's 'objective reasonableness'

19  standard"); *see also Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994) ("the use of force to effect an

20  arrest is subject to the Fourth Amendment's prohibition on unreasonable seizures"). The Supreme

21  Court explained,

22          [T]he "reasonableness" inquiry in an excessive force case is an objective one: the
            question is whether the officers' actions are "objectively reasonable" in light of the facts
23          and circumstances confronting them, without regard to their underlying intent or
            motivation. An officer's evil intentions will not make a Fourth Amendment violation out
24          of an objectively reasonable use of force; nor will an officer's good intentions make an
            objectively unreasonable use of force constitutional.
25

26  *Graham*, 490 U.S. at 396-97 (internal citations omitted).  In applying this standard, the fact-finder

27  considers "the totality of the circumstances and . . . whatever specific factors may be appropriate in a

28  particular case." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010).  In short, the court must

1   balance the force used against the need for the use of force. *Liston v. County of Riverside*, 120 F.3d

2   976.

3         To evaluate objective reasonableness, courts consider "the severity of the crime at issue,

4   whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is

5   actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing

6   *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). Courts must also consider "the quantum of force used"

7   "because the 'factors articulated in *Graham*, and other factors bearing on the reasonableness of a

8   particular application of force are not to be considered in a vacuum but only in relation to the amount

9   of force used to effect a particular seizure.'" *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir.

10  2007) quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir.1994). Ultimately, the "reasonableness" of

11  the actions "must be judged from the perspective of a reasonable officer on the scene, rather than with

12  the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

13        Here, the Court finds the amount of force used was relatively minor. Though the officer was

14  sprinting at full speed at the time he knocked Plaintiff over, Plaintiff does not claim he was injuries in

15  the area where the officer pushed him. This supports the argument that the officer tempered the

16  amount of force he used. Thus, this factor weighs in favor of the reasonableness of officer's action.

17        As to the crime at issue, though a serious felony (Cal. Pen Code §§ 459, 460), does not

18  necessarily constitute a violent crime. *Beaver v. City of Federal Way*, 507 F.Supp.2d 1137, 1144

19  (W.D. WA 2007) [Describing a daytime residential burglary without visible weapons as "lessen[ing]

20  the overall sense of danger."]; *Chew v. Gates*, 27 F.3d 1432, 1443, n. 11 (9th Cir. 1994) ["[T]he fact

21  that 'an unarmed suspect has broken into a dwelling at night does not automatically mean he is

22  physically dangerous.' *Id*. at 21, 105 S.Ct. at 1706. The [*Garner*] Court also took notice of statistics

23  showing that burglaries only rarely involve physical violence, and of the FBI's classification of

24  burglary as a "property" rather than a "violent" crime. *Id*."] quoting *Tennessee v. Garner*, 471 U.S. 1,

25  11 (1985). However, on the sliding scale of severity, this crime—especially what the officers on the

26  scene knew of it to—would likely fall farther on the spectrum toward severe, though certainly not to

27  the level of severity where a person's life was placed at risk. Even still, this factor weighs in favor of

28  the reasonableness of officer's action.

More troubling, however, is the next *Graham* factor, which considers whether the plaintiff posed an immediate threat to the officer or others.  Though the plaintiff used a rock to attempt to break the door lock, no one, including the officer or the reporting witness, saw him with the rock once he left the doorway (Doc. 36-4 at 11) and no one claims to have seen any weapon in Plaintiff's hands or saw him reaching for one. (Doc. 36-4 at 14 [The officer did not recall seeing the plaintiff hands go toward the front of his body.]  Likewise, there is no suggestion that Plaintiff acted threateningly toward the officer or anyone else and, indeed, there is no evidence that there was anyone else around. When the officer pushed Plaintiff to the ground, he was in a parking lot and there is no evidence there was any risk he could attempt to enter another apartment unit.[2]  Notably, the officer indicated that his concern was that Plaintiff could break into a run or turn toward the officer and threaten a fight. (Doc. 37-2 at 33)  However, Defendants do not offer any articulable facts to support that either concern was likely to occur in this instance and it appears to be a generalized fear existing in every police contact with a suspect. *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001) ["A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."]

In any event, the Court must credit the facts endorsed by Plaintiff who indicates he was walking at a leisurely pace and, there is no indication he was acting suspiciously or attempting to secret himself in any manner.  Moreover, Plaintiff did not act in any way to indicate his awareness of the police presence or react to the officer's repeated, yelled commands—from as close as ten yards. Indeed, initially, Officer Miller thought that Plaintiff did not hear his order to stop. (Doc. 37-2 at 20) The Defendants provide no explanation why Plaintiff's apparent continued unawareness of the police presence did not alert Officer Miller that something was awry.

In any event, while there is a strong government interest in apprehending felons, leaving the scene of a felony, alone, does not automatically justify the use of force. <u>Mattos v. Agarano</u>, 661 F.3d

---

[2] Defendants did not provide evidence whether there was a "choke-point" exit from the parking lot such that the back-up officer could have prevented Plaintiff's escape by simply parking his patrol car across the driveway or whether this the property was not surrounded by fencing. *Chew*, at 1441 n. 5 (9th Cir.1994) ["[T]he availability of alternative methods of capturing or subduing a suspect may be a factor to consider" when evaluating the reasonableness of the officer's use of force.]  Thus, the Court is required to presume at least this one lesser intrusive means for preventing Plaintiff from leaving the property, was available.

433, 441 (9th Cir. 2011) ["there are no per se rules in the Fourth Amendment excessive force context."] Indeed, more than a decade ago, the Ninth Circuit rejected that force may always be used to apprehend a felon. *Chew v. Gates*, 27 F.3d 1432, 1443, n. 11 (9th Cir. 1994). The Court stated that the "assumption that anything short of deadly force may constitutionally be used to apprehend a felon . . . conflicts with the holding and the reasoning of *Graham* as well as with prior circuit law." *Id.* Thus, the Court concludes that though the plaintiff was leaving the area, there is no evidence he reasonably appeared to be doing so to evade arrest. Thus, this "most important" factor (*Chew at* 1441, n. 5) weighs against the use of force to make the detention.

Defendants contend *Graham* is similar to the matter now before the Court. (Doc. 36-1 at 12-13) The Court disagrees. In *Graham*, the plaintiff sought "to recover damages for injuries allegedly sustained when law enforcement officers used physical force against him during the course of an investigatory stop." *Id.*, 490 U.S. at 388. During the stop, the driver told the police that Graham was "suffering from a 'sugar reaction.'" *Id.* Graham exited the vehicle, in which he was a passenger, "ran around it twice, and finally sat down on the curb, where he passed out briefly." *Id.* at 399. The driver pleaded with officers to get Graham some sugar, but an officer "rolled Graham over on the sidewalk and cuffed his hands tightly behind his back, ignoring [the] pleas." *Id.* The Court noted:

> Several officers then lifted Graham up from behind, carried him over to [the] car, and placed him face down on its hood. Regaining consciousness, Graham asked the officers to check in his wallet for a diabetic decal that he carried. In response, one of the officers told him to "shut up" and shoved his face down against the hood of the car. Four officers grabbed Graham and threw him headfirst into the police car…. At some point during his encounter with the police, Graham sustained a broken foot, cuts on his wrists, a bruised forehead, and an injured shoulder; he also claims to have developed a loud ringing in his right ear that continues to this day.

*Id.* at 389-390. The officers did not believe Graham was having a reaction due to diabetes, but was instead resisting. *See id.* at 389-90. Defendants, here, explain, "While the [*Graham*] Plaintiff's actions were later explained as a medical condition, the officer was not privy to this information prior to his decision to act. The U.S. Supreme Court found that the officer's actions were therefore entirely reasonable." (Doc. 36-1 at 12)

To the contrary, the Supreme Court *reversed* the grant of a directed verdict in favor of the defendants. *Graham* at 399 ["Because the Court of Appeals reviewed the District Court's ruling on the

motion for directed verdict under an erroneous view of the governing substantive law, its judgment must be vacated and the case remanded to that court for reconsideration of that issue under the proper Fourth Amendment standard."]  Notably, the Supreme Court expressly rejected the more stringent, four-part test imposed on the *Graham* plaintiff to find a Fourth Amendment violation, by the district court and the court of appeals. Thus, rather than finding the officer's conduct to be reasonable, the Court made is less likely that either lower court would do so on remand.

Still relying on *Graham,* Defendants argue, "While it may now be explained that Mr. Trevino was not disregarding Officer Miller's orders to stop, Officer Miller had no idea that Mr. Trevino was deaf." (*Id.* at 12)  Defendants argue:

> What Officer Miller did know was that he was responding to a call for service wherein the reporting party indicated that the Plaintiff was attempting to break into an apartment with a rock and by kicking the door handle. The reporting party specifically referenced the rock, which is a weapon that could cause harm. Therefore, it was reasonable for Officer Miller to believe he was confronting a suspect with a weapon that could cause harm.  When Officer Miller arrived on the scene is observed Mr. Trevino and called out to him to stop. Mr. Trevino walked in the other direction and did not slow or pause. Officer Miller continued to call out and chase after Mr. Trevino. When he ultimately reached him, Officer Miller pushed Mr. Trevino down onto the grass.

(*Id.* at 36-1 at 12-13)  Defendants argue the amount of force used was "entirely reasonable," seemingly, because Officer Miller "pushed [Plaintiff] onto the ground" rather than using greater force that could have been inflicted by his baton or taser. (*Id.* at 13)  However, of course, the quantum of force used is only one factor for the Court to consider.

Defendants rely also on *DeContreras v. City of Rialto*, 894 F.Supp.1238 (C.D. CA 2012).  They argue *DeContreras* is "directly on point." (Doc. 36-1 at 16)  Notably, however, the officers responded to a fight occurring in a home where one of those involved had a knife.  *DeContreras* at 1264.  When the officers entered the home, they found DeContreras and Diaz fighting.  *Id*.  Diaz immediately stopped fighting and surrendered to the officers.  *Id*.  However, DeContreras assumed a fighting stance, advanced at the officers and shouted at them, "shoot me m****r f****r." *Id*.  The officers tazed him and only later learned he was deaf.  *Id*.

Likewise, Defendants rely on *Love v. City of Mobile*, 2011 WL 3843697 at *2 (S.D. Ala. Aug. 29, 2011) aff'd, 478 F. App'x 652 (11th Cir. 2012), which also involved a deaf man.  In *Love*, plaintiff locked himself in a bathroom at a store and, due to failing to take his psychotropic meds, began

speaking in his alter ego's voice and made statements about getting knives and getting cut. *Id*. at 1. When the officers arrived, unaware the suspect was deaf, they ordered him to open the door but received no response. *Id*. They tried to pry the door open and sprayed pepper spray under the door but still received no response, though water began pouring out from under the door. *Id*. at 2. Once they finally pried the door open, the plaintiff slammed it closed in their faces and, when they opened it again, the plaintiff lunged at them with an open umbrella. *Id*. The officers tazed the plaintiff three times before he dropped the umbrella and stopped trying to get to his knees. *Id*. at 3-4. In finding that the force used was reasonable, the court noted that the officers did not know the plaintiff was deaf but more importantly, found the plaintiff was actively resisting arrest. *Id*.

The cases upon which Defendants rely, provide little assistance. Unlike here, in *DeContreras* and *Love*, the suspects actively posed a threat to the safety of the officers. Likewise, the fact that the suspects were deaf played no role in the failure of the suspects to comply or incited them to attack the officers.

For his part, Plaintiff asserts the force used by Officer Miller was not reasonable and summary judgment is not appropriate "because genuine disputes exists at to the facts and circumstances" of the encounter between Plaintiff and Officer Miller. (Doc. 37 at 10, emphasis omitted) Plaintiff contends there are disputes as to whether Plaintiff "posed a threat, let alone a serious threat, to anyone." (*Id.* at 11) In addition, Plaintiff observes "there are disputes as to whether Mr. Trevino looked in Ryan Miller's direction, or increased his pace at any point in time before Ryan Miller tackled him." (*Id.* at 11-12) In essence, Plaintiff argues that there was reason for Officer Miller to doubt whether Plaintiff heard or could hear the commands before Miller used the force.

Indeed, the evidence reveals several conflicts between the facts presented by Officer Miller and Plaintiff. Officer Miller testified that when he arrived at the apartment complex, he saw Plaintiff walking about 20 to 30 yards away. (Doc. 36-4 at 11, Miller Depo. 33:10-13) Officer Miller reported he "called out" to Plaintiff, who "looked right at [Officer Miller]" and kept walking. (*Id.* at 12, Miller Depo. 34:5-16) Officer Miller also reports that Plaintiff "[a]ppeared to" increase his speed while walking away. (*Id.*, 34:24-25) Plaintiff, however, testified he "did not look at or see [Officer] Miller, or even see a police car arrive at the apartment complex. (Doc. 37-3 at 2, Trevino Decl. ¶ 6) Instead,

Plaintiff reported he was walking at a "leisurely pace," and was first aware of the presence of a police officer "[a]fter [he] was pushed to the ground" and "saw the stripe from his pants and the – the baton." (Doc. 37-2 at 42, Trevino Depo. 47:13-16; Trevino Decl. ¶ 5)  Thus, the accounts conflict related to Plaintiff's actions prior to the officer forcing him to the ground, which are relevant to the determination of "whether he [was] actively resisting arrest or attempting to evade arrest by flight." *See Graham*, 490 U.S. at 396.

Given the conflicting evidence presented by Officer Miller and Plaintiff, Defendants have not met their burden to show an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.  A jury must make credibility determinations and resolve the conflicts between the evidence.  *See T.W. Electrical Serv., Inc.*, 809 F.2d at 630.

### 3.    Qualified Immunity

Defendants contend Officer Miller is entitled to qualified immunity, which protects government officials from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine of qualified immunity "balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).

The threshold inquiry to a qualified immunity determination is whether the facts alleged, when taken in the light most favorable to the plaintiff, demonstrate that the official's conduct violated a statutory or constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If the alleged conduct would not be considered a violation, the inquiry stops and the defense of qualified immunity applies. *See id.*  However, if a constitutional violation occurred, the Court must next determine whether the statutory or constitutional right was "clearly established."  *Id.*  Defendant has the burden to prove that he is entitled to qualified immunity. *Moreno v. Baca,* 431 F.3d 633, 638 (9th Cir.2005).

#### a.    Whether a constitutional violation occurred

As discussed above, Plaintiff's version of the encounter with Officer Miller is that he was

1   walking at his apartment complex, without any weapon in hand,[3] when Officer Miller knocked him to

2   the ground without a warning or provocation.  Accordingly, for purposes of summary judgment, the

3   facts demonstrate a violation of Plaintiff's right to be free from the excessive use of force.

4           *b.*        *Whether the right was "clearly established"*

5           A right is "clearly established" in the context of qualified immunity if "it would be clear to a

6   reasonable officer that his conduct was unlawful in the situation he confronted' . . . or whether the state

7   of the law [at the time of the violation] gave 'fair warning' to the official[] that [his] conduct was

8   unconstitutional." *Clement v. Gomez*, 298 F.3d  898, 906 (2002) (quoting *Saucier*, 533 U.S. at 202).

9   This inquiry "must be undertaken in light of the specific context of the case, not as a broad general

10   proposition." *Saucier*, 533 U.S. at 201. "This is not to say that an official action is protected by

11   qualified immunity unless the very action in question has previously been held unlawful, but it is to say

12   that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483

13   U.S. 635, 640 (1987).

14           The right to be free from excessive force and the general principle that "force is only justified

15   when there is a need for force" were clearly established prior to October 2013. *Blankenhorn v. City of*

16   *Orange*, 485 F.3d 463, 481 (9th Cir. 2007) ("In assessing the state of the law at the time of

17   [defendant's] arrest, we need look no further than Graham's holding . . . ") Triable issues of fact here

18   precluding a grant of qualified immunity for Officer Miller.  Adopting Plaintiff's version of the facts, it

19   should have been clear to a reasonable officer that he lacked justification to knock Plaintiff to the

20   ground given that he was not behaving aggressively or threateningly toward the officer or anyone else,

21   there was no one else around, and he did not appear to be leaving the area to evade arrest,.  *See id.*

22   Finally, as noted above, the mere fact that Plaintiff was leaving the scene of a felony, alone, was

23   insufficient justification to use force.  Accordingly, qualified immunity is not warranted at this time.

24   *See also Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010) (premature to

25   find qualified immunity where there remained unresolved issues of fact regarding whether officers

26   violated the plaintiff's Fourth Amendment rights and whether the officers' belief in the legality of their

27

28         [3] Although the dispatch report indicated the suspect was using a rock to beat the door, Officer Miller testified he did not see a rock in Plaintiff's hand.  (Doc. 36-4 at 11, Miller Depo. 33:4-6)

1   actions was reasonable).

2       Consequently, Defendants' motion for summary judgment on Plaintiff's claim for a violation of

3   his right to be free from the excessive use of force is **DENIED**.

4       **B.      Second and Third Cause of Action: Violations of the Rehabilitation and Title II of**

5               **the Americans with Disabilities Act against the City**

6       Plaintiff asserts Defendants are liable for violations of the Americans with Disabilities Act and

7   the Rehabilitation Act for the actions taken in his encounter with Officer Miller.  (Doc. 1 at 13-16)  Both

8   the ADA and RA prohibit discrimination on the basis of disability.  The Ninth Circuit explained, "The

9   ADA applies only to public entities, whereas the RA proscribes discrimination in all federally-funded

10  programs." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002).

11      Title II of the ADA provides that "no qualified individual with a disability shall, by reason of

12  such disability, be excluded from participation in or be denied the benefits of the services, programs, or

13  activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

14  Title II applies to law enforcement agencies and arrests. *Sheehan v. City & Cty. of San Francisco*, 743

15  F.3d 1211, 1232 (9th Cir. 2014) *rev'd in part, cert. dismissed in part sub nom., City & Cty. of San*

16  *Francisco, Cal. v. Sheehan*, 135 S. Ct. 1765 (2015).  To make succeed on a claim for a violation of

17  Title II of the ADA, a plaintiff must establish:

18          (1) he is an individual with a disability; (2) he is otherwise qualified to participate in or
            receive the benefit of some public entity's services, programs, or activities; (3) he was
19          either excluded from participation in or denied the benefits of the public entity's services,
            programs, or activities, or was otherwise discriminated against by the public entity; and
20          (4) such exclusion, denial of benefits, or discrimination was by reason of [his] disability.

21  *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004) (quoting *Thompson v. Davis*, 295

22  F.3d 890, 895 (9th Cir. 2002)).

23      The Ninth Circuit has also determined that "[t]o recover monetary damages under Title II of the

24  ADA or the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the

25  defendant." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (2001) (citing *Ferguson v. City of*

26  *Phoenix*, 157 F.3d 688, 674 (9th Cir. 1998)).  This requires a plaintiff to establish the defendant was

27  "deliberately indifferent" to his disability, which "requires both knowledge that a harm to a federally

28  protected right is substantially likely, and a failure to act upon that likelihood." *Id.* at 1139 (citing

1   *City of Canton v. Harris*, 489 U.S. 378, 389 (1988).

2       Oddly, Plaintiff presents significant evidence regarding the training the City provided its

3   officers, including defendant Miller.  Plaintiff contends, "Bakersfield Police Department officers are

4   trained that a person not answering a question or obeying a command or instruction may be an indicator

5   of a hearing impairment."  (Doc. 37 at 7)  Plaintiff asserts the officers' training includes "POST

6   Learning Domain 37," which addresses how officers should interact with people with disabilities.  (*Id.*;

7   *see also* Doc. 37-2 at 53-62)  Specifically, Learning Domain 37 provides, in relevant part:

8       Many indicators can alert an officer that an individual may be deaf or hard of hearing.
        These indicators include, but are not limited to the following:
9           • use of signing
            • wearing hearing aid(s)
10          • use of a signal dog
            • speaking with difficulty or in an unconventional method
11          • pointing to an ear and shaking the head negatively
            • point to an ear and then lips
12          • reaching for a pad and pencil
            • **failing to respond to an officer's questions or statements**
13          • **failing to follow an officer's instructions or commands**
            • attempting to gain attention through body movement or touching (e.g., foot
14             stomping, hand waiving, clapping hands, etc.)

15   (Doc. 37-2 at 55, emphasis added)  In addition, as Plaintiff observes, Learning Domain 37 directs

16   officers in the field to "be aware of the act that if a person does not answer a question or obey a

17   command or instruction, he or she may not be refusing to cooperate.  If the person is deaf or hard of

18   hearing, he or she may not hear the officer or even been aware of the officer's presence."  (*Id.* at 56)

19       Also, Plaintiff offered the testimony of BPD Detective Andrea Pflugh, a "person most

20   knowledgeable" designated by the City, who testified to training given officers that addresses how they

21   are to recognize and respond to those with physical and mental disabilities, including deafness.  (Doc.

22   37-2 at 68-103)  As in Learning Domain 37, Pflugh testified that BPD officers are trained that if a

23   person doesn't respond or doesn't answer, this may be an indication that the person has a hearing

24   impairment."  *Id.* at 75-75.

25       Charles Sherman, another of the City's designated "person most knowledgeable," testified that

26   if there is a situation not specifically addressed in the Bakersfield Police Department policies, he would

27   expect an officer to rely upon training and education, including POST training.  (Doc. 37-2 at 119,

28   Sherman Depo. at 18:17-23)  Accordingly, Plaintiff contends that officers, such as defendant Miller

were "trained that an indicator of a person being hard of hearing is a failure to respond to an officer's questions or statements," and another indicator "is failing to follow an officer's instructions or commands." (Doc. 37 at 7)  Thus, Plaintiff contends "Ryan Miller could and should have applied his POST and Bakersfield Police Department training in order to recognize Jesse Trevino's hearing impairment." (*Id.* at 17)

Significantly, the evidence presented by Plaintiff that Officer Miller failed to comply with his training undermines a finding that the City did not train its officers regarding how to interact with a deaf person, or that the City intended to discriminate against deaf individuals.  To the contrary, the evidence presented by Plaintiff demonstrates that the City *did* train its officers that those with hearing impairments, such as Plaintiff, may not respond to an officer's questions or commands.  Clearly, the City recognized the difficulty deaf persons may have when communicating with officers in the field, and acted upon that recognition by training its officers.  Consequently, Plaintiff fails to show that the City acted with deliberate indifference towards his disability, as required under the ADA and Rehabilitation Act.  *See Duvall v*, 260 F.3d at 1138-139.

Because Plaintiff cannot prove an essential element of his claims for violation of the ADA and the RA, Defendants' motion for summary adjudication of the Second and Third Causes of Action is **GRANTED**. *See Celotex*, 477 U.S. at 322.

**C.     Fifth Cause of Action:  Assault and Battery**

Plaintiff asserts that Defendants are liable for assault and battery in violation of California law. (Doc. 1 at 21-22)  Because these are separate torts under state law, the Court addresses each claim individually.

<u>1.     Assault</u>

Under California law, an assault is a "demonstration of an unlawful intent by on person to inflict immediate injury on the person of another then present." *Lowry v. Standard Oil Co.*, 63 Cal. App. 2d 1, 6-7, 146 P.2d 57 (1944); see also CACI § 1301. "The tort of assault is complete when anticipation of harm occurs." *Kiseskey v. Carpenters' Trust for S. Cal.*, 144 Cal.App.3d 222, 232, (1983).  To succeed upon a claim of assault under California law, a plaintiff must demonstrate: "(1) that defendant intended to cause harmful or offensive contact, or the imminent apprehension of such

contact, and (2) that plaintiff was put in imminent apprehension of such contact." *Brooks v. United States*, 29 F. Supp. 2d 613, 617 (N.D.Cal.1998) (citing Restatement (Second) of Torts § 21 (1965)).

There is no dispute that Officer Miller intended to strike Plaintiff to force him to the ground. However, there are no facts supporting the conclusion that Plaintiff was placed in immediate apprehension of the contact.  To the contrary, Officer Miller struck Plaintiff from behind and Plaintiff admits he did not become aware of any officers on the scene until he was on the ground and looking up at Miller. (Doc. 37-2 at 42)  Thus, Plaintiff cannot prove an essential element of his claim for assault. *See Celotex*, 477 U.S. at 322. Accordingly, summary adjudication of his claim for assault is appropriate, and Defendants' motion is **GRANTED**.

### 2.    Battery

Under California law, a battery occurs when: "[a] defendant intentionally performed an act that resulted in a harmful or offensive contact with the plaintiff's person; (2) [the] plaintiff did not consent to the contact; and (3) the harmful or offensive contact caused injury, damage, loss or harm to [the] plaintiff."  *Brown v. Ransweiler*, 89 Cal.Rptr.3d 801, 811 (2009).  Thus, the claim for battery by a police officer is analogous to a claim for excessive use of force.  *Id.*; *see also Edson v. City of Anaheim*, 63 Cal.App.4th 1269, 1272 (1998) (an officer who uses force in the course of an arrest is not liable for battery unless the plaintiff proves that the force used was unreasonable).  Consequently, a claim for battery under California law is analyzed under the Fourth Amendment's reasonableness standard. *Edson*, 63 Cal. App. 4th at 1274; *Saman v. Robbins*, 173 F.3d 1150, 1156-57 & n. 6 (9th Cir. 1999).

As discussed above, there are disputed questions of fact related to the circumstances of Officer Miller's encounter with Plaintiff—including whether Plaintiff was aware of the officer's presence and was attempting to evade him.  Given the factual disputes that must be resolved to determine whether Officer Miller's actions were reasonable, summary adjudication of Plaintiff's claim for battery is not appropriate.  *See Brown,* 89 Cal. Rptr at 811; *Edson*, 63 Cal.App.4t h at 1272.  Therefore, Defendants' motion for summary adjudication of Plaintiff's claim for battery is **DENIED**.

///

### D.    Seventh Cause of Action:  Negligence

To establish a claim for negligence, Plaintiff "must establish four required elements: (1) duty;

(2) breach; (3) causation; and (4) damages." *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1203 (9th Cir. 2003). In general, "the plaintiff must show that the defendant owed a duty to the plaintiff." *See John B. v. Superior Court*, 38 Cal. 4th 1177, 1188 (2006). The existence of a duty is a matter of law for a court to decide, and under California law, police officers have a duty to use reasonable force. *See Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1100 (2004).

### 1.    Liability of Officer Miller

This standard of "objective reasonableness" under California law is the analog to the standard of reasonableness for Fourth Amendment claims under federal law. As such, federal cases are "instructive" in deciding whether a given exertion of force is reasonable. *See Brown*, 171 Cal. App. 4th at 534. Under *Brown*, the Court's conclusions regarding Plaintiff's Fourth Amendment claim are equally applicable in addressing his negligence claim. *See id.* 171 Cal. App. 4th at 534; *see also Young v. County of Los Angeles*, 655 F.3d 1156, 1170 (9th Cir. 2011). Because, the disputes of fact related to the reasonableness of the force used by Officer Miller preclude a determination on Plaintiff's negligence claim, Defendants' motion for summary adjudication on this seventh cause of action against Officer Miller is **DENIED**.

### 2.    Liability of the City

In the compliant, Plaintiff asserts the City is also liable for negligence. (*See* Doc. 1 at 24) Under California law, a "public entity is not liable for an injury," "[e]xcept as otherwise provided by statute." Cal. Gov't Code § 815. "[D]irect tort liability of public entities must be based on a specific statute declaring them to be liable, or at least creating some specific duty of care, and not on the general tort provisions of Civil Code section 1714." *Eastburn v. Regional Fire Protection Authority*, 31 Cal. 4th 1175, 1183 (2003). "Otherwise, the general rule of immunity for public entities would be largely eroded by the routine application of general tort principles." *Id.* (citations omitted). As the California Supreme Court observed, "the intent of the Tort Claims Act is not to expand the rights of plaintiffs in suits against governmental entities, but to confine potential governmental liability to rigidly delineated circumstances[.]" *Zelig v. Cty. of Los Angeles*, 27 Cal. 4th 1112, 1127 (2002).

Here, Plaintiff never specifies what statute serves as a basis for his negligence claim and, in fact, there is not one. Indeed, under California law, "no state statute sets forth a duty of care with respect to

the supervision, training, retention, or discipline of [police] officers." *Jaramillo v. City of San Mateo*, 76 F.Supp.3d 905, 926 (N.D. Cal. 2014 ); *see also Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1111-15 (2004) (reversing judgment against city for "negligence in the selection, training, retention, supervision and discipline of police officers" and finding no "statutory basis" for the asserted duty of care). Therefore, summary judgment is **GRANTED** as to the City.

## VI.    Conclusion and Order

Given the conflicting evidence presented by the parties related to the circumstances of Plaintiff's encounter with Officer Miller and the reasonableness of the force exerted, Defendants have not carried its burden to show an absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. A jury must make credibility determinations and resolve the conflicts between the evidence. *See T.W. Electrical Serv., Inc.*, 809 F.2d at 630.  Based upon the foregoing, the Court **ORDERS**:

1.    Summary adjudication of Plaintiff's First Cause of Action (to the extent it is based on a theory of unlawful seizure), Second Cause of Action (violation of the Rehabilitation Act), Third Cause of Action (violation of the Americans with Disabilities Act), Fifth Cause of Action (to the extent it is based on assault) and Seventh Cause of Action (negligence against the City) is **GRANTED**; and

2.    Defendants' motion for summary adjudication of the remaining claims—including The First Clause of Action (Fourth Amendment violation for excessive force)[4], Fifth Cause of Action (battery) and Seventh Cause of Action (negligence against Officer Miller)—is **DENIED**.

IT IS SO ORDERED.

Dated:    **March 21, 2016**                     **/s/ Jennifer L. Thurston**
                                                                     UNITED STATES MAGISTRATE JUDGE

---

[4] The denial of Officer's Miller's claim of qualified immunity is denied without prejudice to his raising this defense to the Court once the facts have been determined by the trier of fact.